**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  1:23-cv-00459

ABIGALE BERGUM and
ASHLEY DEMBITZ,

  Plaintiffs,

v.

PROGRESSIVE CASUALTY INSURANCE COMPANY,

  Defendant.

_____

**COMPLAINT AND JURY DEMAND**
_____

  Plaintiffs Abigale Bergum and Ashley Dembitz, by and through their attorneys, J. Bennett Lebsack of Lowrey Parady Lebsack, LLC, make their Complaint and Jury Demand against the above-named Defendant as follows:

**<u>PARTIES</u>**

  1. Plaintiff Abigale Bergum is a resident of and domiciled in Colorado. She resides in Castle Rock, Colorado.

  2. Plaintiff Ashley Dembitz is a resident of and domiciled in Colorado. She resides in Denver, Colorado

  3. Defendant Progressive Casualty Insurance Company is an Ohio corporation with its principal place of business at 6300 Wilson Mills Road, Mayfield Village, OH 44143.

1

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 because it arises, in part, under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.*

5.      This Court has supplemental jurisdiction over Ms. Bergum's state tort claim because it so relates to her Title VII claims to form part of the same case or controversy.

6.      Under 28 U.S.C. § 139(b), venue is proper with this Court because Defendant resides in Colorado and a substantial part of the events giving rise to the claims occurred within this judicial district.

7.      At all relevant times, each Plaintiff was an "employee" under Title VII. 42 U.S.C. § 2000e(f).

8.      At all relevant times, Defendant was an "employer" pursuant Title VII. 42 U.S.C. § 2000e(b).

## ADMINISTRATIVE EXHAUSTION

9.      On October 13, 2021, each Plaintiff filed a Charge of Discrimination with the Colorado Civil Rights Division and U.S. Equal Employment Opportunity Commission alleging sex discrimination and retaliation.

10.     The EEOC issued a Notice of Right to Sue to each Plaintiff on November 23, 2022, which each Plaintiff received on November 30, 2022.

## SPECIFIC ALLEGATIONS

11.     Defendant Progressive is a property-casualty insurer specializing in underwriting automobile liability insurance policies. Defendant Progressive is headquartered in Mayfield

2

Village, Ohio and maintains operations in all 50 states. Along with its affiliates, Defendant Progressive employs over 40,000 employees nationwide.

12.    Defendant is organized into several business units, each dedicated to serving a particular aspect of its insurance business. One of the largest business units is the Claims organization, which employed Plaintiffs.

13.    Defendant hired Ms. Dembitz in 2003 to work in Richardson, Texas. While in Texas, the Texas Zone leader assigned Ms. Dembitz female supervisors. In 2005, Defendant transferred Ms. Dembitz to work in Denver, part of Defendant's West Zone or "Nixon Region," named after the West Zone leader, Mark Nixon. Based on her performance, Defendant promoted Ms. Dembitz several times, eventually to the position of Claims Specialist Sr in 2007. Throughout her more than fifteen years in the West Zone, the West Zone leader assigned Ms. Dembitz solely male supervisors and managers: Matt Simmons, Roberto, Scott Fraser, Michael Scott, Rob Everly, Whitney Simmons, Al Provorse, Jason Deady, and Ben Ferguson.

14.    Defendant hired Ms. Bergum in 2004 as a Claims Representative in Northern Virginia, part of Defendant's East Zone. While in the East Zone, the East Zone leader assigned Ms. Bergum female supervisors. In early 2006, Defendant assigned Ms. Bergum to work in Denver, part of Defendant's West Zone or "Nixon Region."

15.    In contrast to her supervisors in the East Zone, the West Zone leader assigned Ms. Bergum solely male supervisors. Defendant initially assigned Ms. Bergum to work under Matt Simmons, Roberto, and Mark Nixon. Upon being introduced to Ms. Bergum, Defendant's Manager, Roberto, told Ms. Bergum that she had to be nice to his wife or she would have to deal with him. Shortly after, Defendant replaced Roberto with David Webster.

16.     Based on her performance, Defendant promoted Ms. Bergum several times such that when it received her notice of voluntary resignation in 2015, she was a Claims Supervisor. Throughout most of that time, Defendant assigned Ms. Bergum male supervisors.

17.     As of January 2016, Defendant assigned Ms. Dembitz to report to Al Provorse who reported to Jason Deady, who was relatively new to the Denver Office. Mr. Deady initially reported to Terrie Braunholtz who reported to Mark Nixon, but Defendant replaced Ms. Braunholtz with Scott Krank. who reported to Mark Nixon.

18.     Mr. Deady was hostile towards Ms. Dembitz. In his first interaction with Ms. Dembitz, Mr. Deady instructed her to cancel a doctor's appointment she scheduled that day because he wanted her to listen to him talk about how to negotiate. Within a few weeks, Mr. Deady informed Ms. Dembitz that he would be monitoring her phone calls so he could coach her on her negotiation strategies. Mr. Deady made Ms. Dembitz feel uncomfortable, insulted, and intimidated by Mr. Deady. Mr. Deady also told Courtney Schroeder that he would be monitoring her phone calls and monitored those calls. On information and belief, Mr. Deady did not monitor the phone calls of male subordinates.

19.     Defendant's Human Resources received a complaint about Mr. Deady monitoring phone calls. Human Resources instructed Ms. Dembitz that it was not a requirement for Mr. Deady to monitor her calls. On information and belief, Human Resources instructed Mr. Deady not to listen to Ms. Dembitz's calls.

20.     Mr. Deady was inappropriate on Microsoft TEAMS calls. In one incident, Mr. Deady intended to send private messages to another manager. The messages disparaged and insulted a colleague. Mr. Deady's subordinates who observed the inappropriate messages

complained to Human Resources, requesting that Defendant require Mr. Deady to apologize. Defendant did not require an apology or discipline Mr. Deady. In contrast, around this time, Defendant disciplined a female employee, Kelly Dineen, because of inappropriate language on a TEAMS meeting.

21.    Defendant solicited Ms. Bergum in 2019 to return to a Claims Specialist Lead position. Defendant assigned Ms. Bergum to report to Mark Campbell, who reported to Scott Krank, who reported to Mark Nixon. During her approximate thirteen-year tenure in the West Zone, Defendant assigned Ms. Bergum a female supervisor in her chain of command for less than three years. Mr. Campbell was hostile towards Ms. Bergum. He treated her with disdain in front of colleagues and leadership. Following a call with leaders, colleagues, and Claims counsel on a case where Mr. Campbell treated Ms. Bergum with hostility, Mr. Krank, who was on the call, asked Ms. Bergum if she was irritated by Mr. Campbell's behavior. Ms. Bergum told Mr. Krank the call made her uncomfortable. Mr. Krank never followed up with Ms. Bergum about the incident. After the incident, Mark Campbell often ignored Ms. Bergum, standing behind her cubicle to speak with colleagues while refusing to engage with Ms. Bergum. Mr. Campbell also asked Ms. Bergum personal questions about her divorce and relationships. Another one of Ms. Bergum's supervisors received complaints about Mr. Campbell's treatment of Ms. Bergum but failed to act on the complaint.

22.    Shortly after Defendant rehired Ms. Bergum, Mr. Nixon told Zach Weller, a Claims Supervisor, that he was happy to have Ms. Bergum back because she was attractive. One of Mr. Weller's friends in the office informed Ms. Bergum that Mr. Weller shared a photo of Ms. Bergum in a bikini with other employees and discussed with them that she used to do body building

competitions. On information and belief, Mr. Weller obtained the photo online. The only photos of Ms. Bergum in a bikini doing body building competitions are from when she was in high school.

23.    In October 2019, Human Resources received a complaint that Michael Guetzkow, a supervisor, made inappropriate comments to a direct report regarding her physical appearance including her "huge pregnancy Breasts." Human Resources instructed the woman who complained about Mr. Guetzkow to meet with Mr. Guetzkow about the comments. When the woman objected to meeting with him and asked Human Resources to address it, Human Resources asked if the woman's goal was to ruin Mr. Guetzkow's career by pushing the issue further. Human Resources suggested that Mr. Guetzkow was just awkward around women. Human Resources did not document the complaint in Mr. Guetzkow's file. Human Resources informed Mr. Guetzkow about the complaint, and Mr. Guetzkow spent the following weekend scrutinizing the employee's files for errors. After the complaint about Mr. Guetzkow, Defendant installed software of the complaining party's computer that monitored her work. Defendant did not install similar software on the computers of other employees who Mr. Guetzkow supervised.

24.    Shortly after receiving this complaint about Mr. Guetzkow, Defendant promoted him to a manager role. Around this time, Defendant received complaints about a male employee in the Denver office showing up to work intoxicated and drinking during work hours. Defendant promoted that male employee to a different position and assigned his work to the woman who complained about Mr. Guetzkow without giving her any corresponding raise in title or pay.

25.    In 2020, Defendant assigned Ms. Bergum to work as a Claims Specialist Sr.

26.    In the role of Claims Specialist Sr, Defendant trusted Ms. Bergum and Ms. Dembitz to investigate, evaluate, negotiate, and resolve moderate to high complexity and exposure injury

claims involving Defendant's insured customers. Defendant relied on them to work with attorneys representing injured parties and, when necessary, work with attorneys defending Defendant's interests. Defendant entrusted them with high authority limits with most of their claims inventory consisting of moderate to high complexity claims involving multiple vehicles, pedestrians, complex coverage regarding uninsured and underinsured claims, multiple competing claims, potential extra-contractual, litigation, and significant injuries. In this role within the litigation unit, Defendant entrusted Ms. Bergum and Ms. Dembitz with these responsibilities and authority on cases solely in litigation.

27.     At the end of 2018, Defendant assigned Ben Ferguson to supervise Ms. Dembitz. When Defendant transferred Ms. Bergum in 2020 to the position of Claims Specialist Sr, it assigned Mr. Ferguson to supervise her. At that time, Mr. Ferguson also supervised Mohammed Qazi, Cody Sabansky, and Lindsay Burrows.

28.     Throughout their employment, Defendant trained Ms. Bergum and Ms. Dembitz about insurance laws, particularly those that could expose Defendant or its insureds to excess liability. Stemming from a corporate audit, in 2020, Defendant's casualty division implemented new practices that resulted in violations of Colorado's Unfair Claims Settlement Practices Act, excess exposure to Defendant's insured customers, and bad faith exposure to Defendant. Mr. Ferguson, Jason Deady, Scott Krank, and Human Resources received complaints from Ms. Bergum about these practices including refusing to pay on a claim where a drunk driver ran a red light and refusing to pay claim where a driver hit a pedestrian.

29.     Mr. Ferguson unfairly scrutinized Ms. Bergum and Ms. Dembitz's performance.

7

30.     For instance, Mr. Ferguson called, emailed, and instant messaged Ms. Bergum about inconsequential issues even after work hours. Once, Ms. Bergum settled a case within her authority limit, but Mr. Ferguson sent her a message because she did not seek authority to settle the case for $34 over her authority based on her evaluation of the case at that value. In November 2020, Mr. Ferguson emailed Ms. Bergum that he knew she was too busy to work on some files, but she should still make a note that she was working on them. At 4:50pm the day before Ms. Bergum was going on vacation, Mr. Ferguson sent Ms. Bergum an instant message explaining that while her handling of a claim was "on track," and "all good," she had not performed a few unnecessary actions.

31.     Mr. Ferguson often asked women he supervised to perform tasks they had already performed or duplicate work for no good reason. For instance, he required Ms. Bergum complete a specific claims diary system but did not require the men on his team to maintain any such diary. When Ms. Bergum complained to him about this, Mr. Ferguson acknowledged this to be the case.

32.     Mr. Ferguson often gave direction in claim files that conflicted with the advice of defense counsel and was against the best interest of Progressive's insured customer. When Mr. Ferguson saw notes in the claims files from Ms. Bergum and Ms. Dembitz documenting their disagreement with his direction, Mr. Ferguson interpreted it as them being insubordinate and disparaged them for including such notes in the file.

33.     Mr. Ferguson did not subject the men he supervised to similar scrutiny. And a man on his team noticed. On May 6, 2021, Cody Sobansky, another Claims Specialist Sr, sent Ms. Dembitz a Slack message saying Mr. Ferguson "treats women differently than men" and "I see it all the time with how he handles situations with you and [Ms. Bergum] vs. how he treats me." On

May 11, 2021, Ms. Bergum, Ms. Dembitz, and Lindsey Burroughs discussed on Slack how Mr. Ferguson made them set standing bi-weekly meetings with him. Mohammad Qazi, also a Claims Specialist Sr, informed them that Mr. Ferguson had no such requirement for him. Mr. Sobansky noted that he only had to meet with Mr. Ferguson monthly.

34.     In addition to subjecting the women on his team to heightened scrutiny, Mr. Ferguson also assigned them more claims to resolve than men. Until working for Mr. Ferguson, Ms. Bergum had not experienced issues with unequal claims distribution on her teams. And until working for Mr. Ferguson and Mr. Deady, Ms. Dembitz quietly tolerated Defendant's excessive assignment of claims to her.

35.     Mr. Ferguson received complaints about inequitable claims distribution from Ms. Bergum and Ms. Dembitz in April, May, and June 2020. Ms. Bergum and Ms. Dembitz escalated those complaints to Jason Deady, Scott Krank, and Human Resources in May 2020, June 2020, September 2020, and December 2020.

36.     After months of complaints, Defendants purported to implement a policy that it would cap new claims assignments at two per day. But Defendant frequently assigned each of them more than two claims per day, including assigning Ms. Bergum seven in one day while one peer received one and another received none. And Mr. Ferguson assigned Ms. Bergum and Ms. Dembitz new claims while on vacation or paid time off while exempting male employees from new claims assignments while on vacation and paid time off.

37.     Defendant's Human Resources received numerous complaints about Mr. Ferguson's inequitable treatment of the women on his team. It received complaints from Ms. Bergum and Ms. Dembitz in June 2020, December 2020, March 2021, May 2021, and June 2021.

38.     In spring 2021, Defendant's Human Resources received comprehensive data from Ms. Bergum about Mr. Ferguson's inequitable distribution of claims between the male and female members of his team.

39.     Human Resources met with Ms. Bergum and Ms. Dembitz, informed them it would investigate their concerns, but never followed up with any solutions to their complaints. Human Resources blamed its lack of expertise on how claims are handled for its failure to remedy the complaints.

40.     In February 2021, Mr. Ferguson and Mr. Krank received complaints from Ms. Bergum about Defendant's practices causing lawsuits and excess exposure against Defendant's insureds. In April 2021, Jason Deady received an email from Ms. Bergum explaining her concern that Defendant's practice of predetermining future settlement offers regardless of the claimant's demand was or what new information Defendant received could be interpreted as Defendant not considering new information on its merits and adjusting its offers accordingly, which Colorado law requires. When Mr. Deady pushed back on Ms. Bergum, she explained "I realize this is hypothetical but if we are doing it on all or most ARBI claims it would be considered a business practice/process. Just food for thought, I wouldn't want to be deposed about it."

41.     In October 2020, Mr. Ferguson felt disrespected by one of the women on his team when she expressed, in his words "frustration and discontent," with his supervision of her. Mr. Ferguson entered a verbal performance warning in Ms. Dembitz's personnel file but did not actually give Ms. Dembitz a verbal warning or tell her that he was entering the warning into her personnel file.

42.    Defendant typically gave Ms. Bergum and Ms. Dembitz positive performance reviews throughout their employment. Year after year, Defendant's objective metrics and measurements showed that Ms. Dembitz was the top performer on her team. Indeed, even in February 2021, Defendant's evaluation of Ms. Bergum notes that "Over the course of the first half of the year, you took over the top spot for closures/day and currently sit at a 0.75 throughput rate." And it's February 2021 evaluation of Ms. Dembitz notes that "you continue to stand out with regard to efficiency in your current role. You have been able to close 0.83 features/day which far exceeds your 2019 result of 0.74 features/day. You also took in 0.85 features/day which was among the highest on the team."

43.    But in the February 2021 evaluation, Mr. Ferguson noted about Ms. Dembitz that "Feedback was sometimes met with friction over the course of the year and I encourage you to continue approaching these discussions with collaboration, solutions and a forward thinking growth mindset." And he gave Ms. Bergum a performance evaluation where he noted "This year has had no shortage of turbulence creating some work environment friction. . . You have consistently been very vocal. . . I'm more than confident in your ability to stay aligned with the processes and expectations while still maintaining efficiency and controlling inventory. As we turn the page to 2021 I ask you to focus on a growth mindset and work to bring a consistent positive influence to the team on a daily basis."

44.    Mr. Ferguson did not actually meet with Ms. Bergum or Ms. Dembitz about the evaluations or their performance, he just made the evaluations available electronically.

45.    Human Resources received complaints from Ms. Bergum in February and March 2021 that the performance evaluation was retaliation for her previous complaints.

11

46.    On April 13, 2021, Mr. Deady formally disciplined Ms. Bergum because of an email mistake she made on March 13, 2021. The discipline included reference to another mistake Ms. Bergum made in 2015. But prior to April 13, 2021, nobody with Defendant informed Ms. Bergum of this 2015 issue. In response to the discipline, Ms. Bergum contacted a member of Defendant's corporate security team to ask if it had any concerns about the email mistake. The person responded "If there would have been a violation of our Guidelines involving those other events you would have been contact. [A]ll is good."

47.    In April 2021, Mr. Ferguson assigned a new claim to Ms. Dembitz. The lawsuit related to the claim had not yet been served on Defendant's insured customer. Defendant had a rule that claims are not assigned to Mr. Ferguson's litigation team unless the lawsuit was served, so Ms. Dembitz added a note to the claim and sent it back. Given the complaint in the case was not served on Defendant or its insured, it was not necessary for Defendant to add the claim to anyone's inventory. The team already had a high workload resulting from changes related to the pandemic. Shortly after, Mr. Ferguson assigned the claim back to Ms. Dembitz with no new information. Ms. Dembitz sent it back again. Mr. Ferguson then assigned the claim to Ms. Bergum, who also sent it back, and another team member, who also sent it back. Ms. Dembitz then reassigned the claim to herself and sent Mr. Ferguson a Slack message that she took the claim back and would work that afternoon rather than burden her team members. Ms. Dembitz complained to Mr. Fergusson that she wished he would have the team's back because the claim did not belong in their department yet. She also asked, "why do we have double standards?" Ms. Bergum also sent a message to Mr. Ferguson questioning the "double standard" in the circumstances surrounding the claim.

48.    Two weeks later, Mr. Ferguson issued Ms. Dembitz a written disciplinary warning for engaging in "unprofessional and disrespectful conduct" because of what she did with the claim and her messages, citing her "double standard" comment. The warning threatened that Mr. Ferguson and Defendant would terminate Ms. Dembitz's employment if she engaged in similar future conduct. The warning cites the previous October 2020 verbal warning, which Ms. Dembitz did not know about until then. Ms. Dembitz responded to the warning with "I have been an employee at Progressive for nearly 20 years, and I have never been warned or written up for anything. To the contrary, I have been a top performer and have had positive Performance Evaluations every year. I understand that before a write-up, a warning is given. I was never warned or coached in October 2020, or ever. I believe that an open and communicative relationship with my boss is important. I don't believe that disagreeing and providing honest feedback should be perceived as disrespectful. I strongly disagree and am dumbfounded by the assertions in the write-up."

49.    Ms. Dembitz complained about the discipline to Human Resources, explaining that Mr. Ferguson had not informed her of any discipline in October 2020. Human Resources told Ms. Dembitz it would investigate. Following Ms. Dembitz's meeting with Human Resources, Mr. Ferguson ignored Ms. Dembitz for the next two months. He literally did not say a word to Ms. Dembitz for the rest of her employment.

50.    In June 2021, Ms. Dembitz complained to Human Resources about Mr. Ferguson ignoring her, and Human Resources responded that her complaint was weird because Mr. Ferguson had just placed a disciplinary coaching summary in Ms. Dembitz's file. Ms. Dembitz asked Human Resources to follow up with her.

51.     Throughout 2021 and 2022, Ms. Bergum, Ms. Dembitz, and other women in Defendant's West Zone share with each other the discriminatory and retaliatory actions and decisions Defendant was making about their employment.

52.     On June 8, 2021, Mr. Ferguson assigned Ms. Bergum seven new claims. Ms. Bergum emailed Mr. Ferguson "I just got a 7th. Seriously? One my peers is at "0" and another one is at "1". What happened to the 2 claim cap?"

53.     On June 9, 2021, Human Resources received a complaint from Ms. Bergum that the seven new claims was a new example of targeting and retaliation. Human Resources informed Ms. Bergum that Ms. Bergum's concerns about retaliation seemed factually based, but that Human Resources did not have the "technical expertise" to help.

54.     On June 10, 2021, Ms. Bergum emailed Mr. Ferguson, Mr. Deady, Mr. Krank, Mr. Nixon, and Human Resources that because of the toxic environment of leadership, Ms. Bergum had no choice but to terminate her employment. Her email explained:

> Progressive as a whole has been a great company to work for.  Overall, the Company has been very  good to me from my time in Virginia as a Generalist, to my transfer back to Colorado and my return to the Company in 2019.  In turn, I have been a hardworking, dedicated, high performing employee for over 12 years. More than once I have been called "Passionate".  I care about what I do and how I do it. I take the companies "Core Values" to heart.
>
> The last year and a half has been by far the most challenging in my career, not because of the role itself, but because of the overwhelmingly toxic environment created by our Casualty Leadership.
>
> Over the years, I have worked for and with a number of different leaders, all with their own personalities and leadership styles.  While we may have not always agreed, I always felt respected and that I could share my perspective without fear of retaliation or punishment.  This is not currently the case.
>
> It was made very clear during my year end PE, my opinions, recommendation and elevation of concerns were not welcome. My PE was in complete opposition to my

14

mid-year and was filled with false, misleading and libelous statements regarding my performance. My review resulting in a "Needs Improvement" and the lack of Merit increase, (which I was told was because "My salary was too high" ) was retaliatory and a clear message to "stay in my lane".

In my 25 years in the insurance industry, I have NEVER had a performance or disciplinary issue until I began raising the following concerns:

1. Assignment inequities
2. Differing expectations between the teams and claim representatives
    1. Recently the litigation team, with the exception of me and Ashley, has been consolidated to Jeanine's team. We have been provided differing explanations as to why Ashley and I are the only ones to remain on Ben's team.
    2. Other team member(s) have recently noted / documented that there is a clear difference in the way Ashley and I are treated not only as compared to the other team members, but also the male team.
3. Volume and lack of staffing
4. Inconsistent / non-existent communication
    1. Over 175 process changes in 2020, many changes made without communication
5. Inability to vary from 2020 post audit claims processes without permission from leadership
6. 2020 post audit process that limits our Defense Counsel's ability to defend their Clients / our Insureds to the best of their ability. IE: experts, inability to negotiate directly with Opposing Counsel when appropriate and without leadership approval.
7. Evaluating claims solely using "tools" (COA and MDP) rather than looking the claim holistically which has resulted in:
    1. Excess exposures to our Insureds
    2. Unnecessary lawsuits thus exposing our insureds to litigation
    3. Unfair Claims Practices

I have example after example after example of the above, many of which have been elevated, documented and dismissed.

I am not the only Litigation Representative to have raised these issues. I have attached a copy of our Casualty Focus Group Feedback. Dena can speak to the level of concern from the team regarding fear of retaliation / punishment for not following the 2020 post-audit "processes" or elevating concerns regarding the unintended consequences following the 2020 post audit rollout.

I spent the last year struggling with my conscience as to whether to do the right thing knowing my audit quality may suffer thus continuing to affect my reviews, career and salary or strictly adhere to the 2020 post-audit process. That inner

15

conflict caused twelve months of stomach pain, internal bleeding and unrelenting anxiety.  Following my PE, I made the decision to do what I felt was right. I'm sure once I have moved on my files will be picked apart and numerous "exceptions" will be found; I welcome the scrutiny because I know not only did I do my job with Progressive's Core Values in mind, I was not in violation of any Unfair Claims Practices. Amazingly, I am no longer have stress related issues.

So, uncle, you win. I have successfully been forced out of the role I'd hoped to retire from.  While I have the ability to leave, others on the team may not. The litigation team is an amazing group of highly experienced, knowledgeable, hardworking (overworked) and dedicated people. Even when completely overwhelmed there is no hesitation to help out a peer or go that extra mile. This is the team other representatives come to for advice and direction.   Their experience and opinions should be recognized and heard, not dismissed.  They should have the autonomy to do their job without having to ask permission and there shouldn't be fear of consequences for simply expressing an opinion or making a suggestion.

I am hopeful the Gallup Survey will open some eyes to the real problem before Progressive loses additional experienced, dedicated, hardworking employees.  It's time to choose people over process & profit.

I have attached a copy of my file spreadsheet so you have an idea of where my claims are currently. I have not touched the 8 new features received since Monday. I will add Ben to my email so he can access it along with my voicemail. You will find all of the pending emails are organized to each attorney. If it's in my inbox, it hasn't been addressed.  This may be an opportunity for leadership experience file handling in order to actually see how much time and effort it truly takes rather than basing staffing solely on the numbers.

Please let me know if you have questions, I am open to talk and/or share information.  This is a sad day for me and something I definitely didn't expect when I agreed to return to the Company.

55.    In late June 2021, after receiving Ms. Bergum's resignation letter, Human Resources followed up with Ms. Dembitz about the purported coaching Mr. Ferguson had with her. Human Resources explained that Mr. Ferguson intended to put the disciplinary coaching summary in Ms. Bergum's file, but that he put it in the wrong woman's file. More, Mr. Ferguson never even met with Ms. Bergum as he purported in the coaching summary. And he never told Ms. Bergum that he was adding documentation about these purported coaching sessions to her

personnel records. But because Ms. Bergum terminated her employment, Human Resources did not investigate the issue further. Human Resources told Ms. Dembitz that Mr. Ferguson admitted that he was avoiding her.

56.    Mr. Ferguson was successful in making Ms. Dembitz feel like she had no choice but to resign her employment. She feared further retaliation from Defendant, particularly that Mr. Ferguson would continue to falsify disciplinary records to support terminating her employment, hurting her reputation in the insurance industry. On June 25, 2021, Ms. Dembitz informed Defendant she was terminating her employment.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF
Sex Discrimination in Violation of Title VII, as amended, 42 U.S.C. § 2000e *et seq.*
Both Plaintiffs Against Defendant

57.    Plaintiffs incorporate all allegations in this pleading into this claim for relief.

58.    Defendant employed Plaintiffs in the position of Claims Specialist Sr.

59.    Plaintiffs were qualified to perform the Claims Specialist Sr role and performed that role satisfactorily.

60.    Despite their performance, Plaintiffs had no choice but to constructively discharge their employment because of sex-based, intolerable working conditions.

61.    Defendant's workplace conditions were so intolerable that a reasonable person in either of Plaintiffs' positions would have had no choice but to constructively discharge her employment.

62.    Because of Defendant's discriminatory conduct, Plaintiffs suffered harms, damages, and losses, including physical and mental pain and suffering, embarrassment,

17

humiliation, emotional distress, impairment of the quality of life, lost wages, and loss of earnings potential.

## SECOND CLAIM FOR RELIEF
Retaliation in Violation of Title VII, as amended, 42 U.S.C. § 2000e *et seq.*
Both Plaintiffs Against Defendant

63.    Plaintiffs incorporate all allegations in this pleading into this claim for relief.

64.    Plaintiffs each opposed practices made unlawful by Title VII by complaining to their supervisor, managers, and Human Resources that they were victims of sex discrimination. Plaintiffs also participated in investigations into their complaints of sex discrimination.

65.    Defendant took actions that a reasonable employee would have found materially adverse, including unfairly and disparately disciplining Plaintiffs, falsifying disciplinary records of Plaintiffs, giving poor performance evaluations, and assigning a disproportionate workload.

66.    Defendant would not have taken these actions but for Plaintiffs' complaints of sex discrimination and participation in an investigation into their complaints of sex discrimination

67.    Because of Defendant's retaliatory conduct, Plaintiffs suffered harms, damages, and losses, including physical and mental pain and suffering, embarrassment, humiliation, emotional distress, impairment of the quality of life, lost wages, and loss of earnings potential.

## THIRD CLAIM FOR RELIEF
Wrongful Termination in Violation of Public Policy – Exercising a Right
Both Plaintiffs Against Defendant

68.    Plaintiffs incorporate all allegations in this pleading into this claim for relief.

69.    C.R.S. § 10-3-1104(h) makes it an unfair method of competition and unfair or deceptive practice in the business of insurance to: refuse to pay claims without conducting a reasonable investigation based upon all available information, not attempt in good faith to

effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear, compel insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recover in actions brought by such insureds, attempt to settle a claim for less than the amount to which a reasonable person would believe she was entitled, delay the investigation or payment of claims by requiring an insured or claimant, or the physician of either of them, to submit a preliminary claim report, and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information, fail to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage, to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement, as a defense or partial offset in the adjustment of a third-party claim the defense of comparative negligence as set forth in C.R.S. § 13-21-111 without conducting a reasonable investigation and developing substantial evidence in support thereof, and fail to adopt and implement reasonable standards for the prompt resolution of medical payment claims.

70.     C.R.S. § 10-3-1103 provides that "No person shall engage in this state in any trade practice which is defined in this part 11 as, or determined pursuant to section 10-3-1107 to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance."

71.     During the course of their employment, Plaintiffs performed their duties as Claims Specialist Sr in accordance with C.R.S. § 10-3-1103 and § 10-3-1104(h) because they reasonably believed they had a right to follow these statutes.

72.     Defendant was aware or reasonably should have been aware that Plaintiffs reasonably believed they had the right to follow these statutes.

73.     Defendant constructively discharged Plaintiffs because they followed these statutes.

74.     Because of Defendant's wrongful conduct, Plaintiffs suffered harms, damages, and losses, including physical and mental pain and suffering, embarrassment, humiliation, emotional distress, impairment of the quality of life, lost wages, and loss of earnings potential.

**FOURTH CLAIM FOR RELIEF**
**Wrongful Termination in Violation of Public Policy – Employer's Improper Directive**
**Plaintiff Bergum Against Defendant**

75.     Plaintiffs incorporate all allegations in this pleading into this claim for relief.

76.     During the course of Plaintiff Bergum's employment with Defendant, Defendant directed her to take actions that violate C.R.S. § 10-3-1103 and § 10-3-1104(h).

77.     Plaintiff Bergum objected to Defendant's directive because she reasonably believed that following the directive would have been a violation of these statutes.

78.     Defendant was aware or reasonably should have been aware that Plaintiff Bergum's refusal to comply with Defendant's directive was based on her reasonable belief that to do so would have been a violation of these statutes.

79.     Defendant constructively discharged Plaintiff Bergum because of her refusal to comply with Defendant's directive.

80.     Because of Defendant's wrongful conduct, Plaintiff Bergum suffered harms, damages, and losses, including physical and mental pain and suffering, embarrassment,

20

humiliation, emotional distress, impairment of the quality of life, lost wages, and loss of earnings potential.

**FIFTH CLAIM FOR RELIEF**
Breach of Contract
Both Plaintiffs Against Defendant

81.     Plaintiffs incorporate all allegations in this pleading into this claim for relief.

82.     Defendant maintains a contract with employees titled "Code of Business Conduct and Ethics" that includes a Commitment to Non-Retaliation, which states that "Retaliation is a violation of this Code. We will not tolerate retaliation against any Progressive person who speaks up in good faith to raise a concern, reports a known or suspected Code violation, or participates in an investigation of a possible Code Violation." The Code promises employees that Defendant "will assess prompt and appropriate discipline, up to and including termination of employment, against any Progressive person who retaliates, or attempts to retaliate, against another Progressive person . . . in response to a concern raised under this Code. Similarly, we will act promptly if any Progressive business associate retaliates, or attempts to retaliate, against any Progressive person for raising a concern under our Code. We are serious about our commitment to non-retaliation and we rely upon you to help us enforce our non-retaliation policy. **Don't hesitate to report concerns about retaliation.** Progressive – and your co-workers – are depending on you." The Code provides that "Speaking up is **not** optional. It is **your duty to speak up** any time you become aware of a concern, even if you aren't sure whether the Code has been violated." Defendant also has an Open Door rule that promises that "Progressive will investigate and respond appropriately to any issue or complaint. Retaliating against someone for making or filing a good faith complaint, cooperating

21

in an investigation related to a complaint, or for participating in any proceeding related to a complaint also violates this policy."

83.     Plaintiffs substantially performed their obligations under this contract by reporting suspect Code violations related to inequitable claims distribution, problems with Mr. Ferguson, concerns about Defendant's compliance with claims practices law, and retaliation.

84.     Defendant failed to perform its obligations under this contract by failing to investigate or respond appropriately to these concerns and to allow retaliation against Plaintiffs.

85.     Defendant's failure to perform its obligations under this contract damaged Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Abigale Bergum and Ashley Dembitz respectfully request that this Court enter judgment in their favor and against Defendant Progressive Casualty Insurance Company and order the following relief as allowed by the law:

A.  Compensatory damages, including but not limited to those for emotional distress, inconvenience, mental anguish, and loss of enjoyment of life;

B.  Back pay and benefits;

C.  Front pay and benefits;

D.  Injunctive and/or declaratory relief;

E.  Punitive Damages;

F.  Attorney fees and costs of the action, including expert witness fees;

G.  Pre-judgment and post-judgment interest at the highest lawful rate; and

H.  Such further relief as justice allows.

22

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted February 17, 2023.

LOWREY PARADY LEBSACK, LLC

*/s/    J. Bennett Lebsack*

J. Bennett Lebsack
1490 Lafayette Street, Suite 304
Denver, CO  80218
Tel. (303) 593-2595
Fax (303) 502-9119
ben@lowrey-parady.com


ATTORNEY FOR PLAINTIFF

23

**CERTIFICATE OF GOOD STANDING**

I hereby certify that I am a member in good standing of the bar of this Court.

LOWREY PARADY LEBSACK, LLC

*/s/     J. Bennett Lebsack*
J. Bennett Lebsack
1490 Lafayette Street, Suite 304
Denver, CO  80218
Tel. (303) 593-2595
Fax (303) 502-9119
ben@lowrey-parady.com

24